# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>THE PREMISES LOCATED AT 1029 EAST GUTIERREZ STREET, SANTA BARBARA, CALIFORNIA 93103 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**
CLERK, U.S. DISTRICT COURT

**06/03/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: dj  DEPUTY

Case No.  2:21-mj-02719 -DUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> *See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> *See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution & possession with intent to distribute of controlled substances |
| 21 U.S.C. § 846 | Conspiracy & attempt to distribute of controlled substances |

The application is based on these facts:

> *See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days *(give exact ending date if more than 30 days:_____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ Christopher Stantzos*
_____
*Applicant's signature*

*Christopher Stantzos, ATF Special Agent*
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  June 3, 2021

_____
*Judge's signature*

City and state: Santa Barbara, CA

Hon. Louise A. LaMothe, U.S. Magistrate Judge
*Printed name and title*

AUSA: Maria Elena Stiteler (x6148)

## **ATTACHMENT A-1**

PREMISES TO BE SEARCHED

The premises to be searched is the portion of the multi-family residence located at 1029 East Gutierrez Street, Santa Barbara, CA 93103 that is located below the street level ("SUBJECT PREMISES 1").  The multi-family residence at 1029 East Gutierrez Street is a house with a white exterior, a stone façade at the front left half of the house, and red-brown roofing.  The entrance to SUBJECT PREMISES 1 is a door with brown trim located at the bottom of the driveway, to the right of a red staircase and to the left of a window with brown trim.

 



i

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

ii

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

e.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

f.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

g.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

h.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

iii

Facebook Messenger, Snapchat, FaceTime, Skype, Signal, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

     i.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

     j.   Contents of any calendar or date book;

     k.   GPS coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

     l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

     m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

     i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

     ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.   evidence of the times the device was used;

       vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

       vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

       viii.    records of or information about Internet Protocol addresses used by the device;

       ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.    <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.    In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be

vii

seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

ix

custody and control of attorneys for the government and their support staff for their independent review.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress Oscar Bello TORRES' ("TORRES") and/or Eric CATALAN's ("CATALAN") thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of TORRES' and/or CATALAN's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Christopher Stantzos, being duly sworn, declare and state as follows:

### I. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint and arrest warrants against Oscar Bello TORRES ("TORRES") and Eric CATALAN ("CATALAN") for violations of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2.   This affidavit is also made in support of an application for warrants to search:

a.   The premises located at 1029 East Gutierrez Street, Santa Barbara, California 93103, as described further in Attachment A-1 ("SUBJECT PREMISES 1");

b.   The premises located at 1212 Punta Gorda Street, Space 13, Santa Barbara, California 93103, as described further in Attachment A-2 ("SUBJECT PREMISES 2");

c.   A black 2008 BMW 1-Series bearing California license plate number 7EAY511, as described further in Attachment A-3 ("SUBJECT VEHICLE");

d.   The person of Eric CATALAN ("CATALAN"), as described further in Attachment A-4; and

e.   The person of Oscar Bello TORRES ("TORRES"), as described further in Attachment A-5.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances) and 21 U.S.C. § 846

(conspiracy and attempt to distribute controlled substances)
(the "Subject Offenses"), as described more fully in Attachment
B.  Attachments A-1, A-2, A-3, A-4, A-5, and B are incorporated
herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrants, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II.  <u>BACKGROUND OF SPECIAL AGENT CHRISTOPHER STANTZOS</u>

5.    I am a Special Agent ("SA") with the Bureau of
Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been
for one year.  I was hired by ATF in March 2020 and attended the
ATF Academy from March through December 2020, where I received
approximately 1,000 hours of formal training in various aspects
of conducting firearms, explosives, arson, firearms trafficking,
and gang investigations.  Before joining the ATF, I was an
Intelligence Analyst ("IA") for the Federal Bureau of
Investigation ("FBI") for approximately four and a half years.
As an IA, I produced intelligence products in furtherance of
civil rights investigations and complex international money
laundering investigations.  Before joining the FBI, I was a

2

forensic scientist for the Washington, DC Department of Forensic Sciences for nearly two years, where I identified, documented, preserved, and collected physical evidence from crime scenes.

6.    I have participated in many aspects of gang, firearms, and drug investigations, including undercover operations, arrests, and surveillance.  I have also debriefed multiple informants and witnesses who had personal knowledge regarding illegal firearms and drug trafficking.  I am familiar with firearms and drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, as well as the collection of money proceeds of drug-trafficking and money-laundering methods used to conceal the nature of the proceeds.  I am familiar with the methods employed by gang members to thwart detection by law enforcement including the use of cellular telephone technology, counter-surveillance techniques, false or fictitious identities and addresses, money-laundering techniques, and coded language.

7.    Currently, I am assigned to the Los Angeles Field Division, Santa Maria Satellite Office ("SMSO") of the ATF.  I have been assigned to the SMSO since March 2020, in which time I have participated in controlled purchase operations, undercover operations, and gang investigations in Los Angeles, Santa Barbara, and San Luis Obispo Counties.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    In January and February 2021, the ATF and the Santa Barbara County Sheriff's Office ("SBSO") identified CATALAN as a distributer of methamphetamine in the Santa Barbara and Lompoc,

CA areas.  The ATF and SBSO further identified CATALAN's
methamphetamine supplier as TORRES, a pound-quantity
methamphetamine dealer for the "Krazies," a criminal street gang
affiliated with the East Side Santa Barbara street gang in Santa
Barbara, CA.  On January 13, 2021, an undercover ATF
confidential information (the "CI") purchased approximately 80
grams of methamphetamine from CATALAN.  On February 10, 2021,
the CI purchased approximately 408 grams of methamphetamine from
TORRES, who was enlisted and assisted by CATALAN.  And on
February 22 and March 2, 2021, the CI purchased approximately
328 grams and 534 grams, respectively, of methamphetamine from
TORRES.

     9.   Through these multiple, recorded, undercover
purchases, law enforcement determined TORRES resided at SUBJECT
PREMISES 1.  For two of these purchases, TORRES carried the
methamphetamine from SUBJECT PREMISES 1 to the location of the
purchase.  Law enforcement further determined that TORRES
operated the SUBJECT VEHICLE for personal use and to store
methamphetamine.  Further, during a recorded methamphetamine
transaction in March 2021, TORRES explained that he used a
residence in the area of the 1100 Block of Punta Gorda Street,
Santa Barbara, CA 93103, as a "trap pad" -- a stash house used
to store drugs and other contraband.  Through surveillance of
TORRES and the SUBJECT VEHICLE, in April 2021 law enforcement
determined the "trap pad" was SUBJECT PREMISES 2, which TORRES
is currently visiting on a near daily basis.

IV. <u>STATEMENT OF PROBABLE CAUSE</u>

10.   Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, I know the following:

A.   **Identification of CATALAN as Source of Illegal Drugs**

11.   On January 2, 2021, at ATF Special Agent Bryan Traverso's direction, an ATF CI[1] called a target of a drug investigation with initials C.S.  In that call, which was recorded and which I have reviewed, the CI asked C.S. how much a "p" of "broken window" would cost.  From my training, experience, and conversations with senior law enforcement officers, I understand that this is coded language that refers to a pound of methamphetamine.  C.S. stated that he would get on that, and that the CI could buy it in Lompoc, California.

12.   On January 4, 2021, at SA Traverso's direction, the CI called C.S.  During this call, which was recorded and which I reviewed, C.S. and the CI agreed, in substance and in part, on a $3,200 purchase price for a pound of methamphetamine, which the CI could purchase from C.S.'s associate.  C.S. told the CI that he would send his supplier's "snap" (Snapchat contact information).

---

[1] The CI has provided reliable, credible, and actionable intelligence that ATF corroborated through independent ATF investigations.  In 2015 the CI was charged with federal racketeering conspiracy, drug, and firearms violations, to which he has since pleaded guilty.  The CI is cooperating with the ATF for consideration in the federal case and financial compensation.

13.   Also on January 4, 2021, C.S. sent the CI a series of Snapchat messages.[2]  Due to the encrypted nature of Snapchat communications, agents were unable to document all portions of the January 4, 2021 Snapchat conversation between the CI and C.S.  However, I have reviewed the portion of the conversation that was saved, and it shows that C.S. sent the message "3200" to the CI (referencing the price of a pound of methamphetamine) and then provided the CI with a Snapchat profile labeled "Eric Catalan."  From my review of the CI's communications with C.S., I understood that C.S. identified "Eric Catalan" as a supplier of methamphetamine.

### B.   January 13, 2021 Purchase of Approximately 80 Grams of Methamphetamine from CATALAN

14.   On January 4, 2021, at SA Traverso's direction, the CI messaged the Snapchat contact for "Eric Catalan" that C.S. had provided.  Due to the encrypted nature of Snapchat communications, agents were unable to document all portions of this Snapchat conversation; however, the saved portion of the conversation shows that the CI asked "Eric Catalan" "What's your digits I'll get at you right now."  As I understand from a conversation with SA Traverso, the CI told SA Traverso that the CI and "Eric Catalan" exchanged telephone numbers in the portion of the Snapchat conversation that was not preserved.

---

[2] I am aware from my training and experience in computer and digital investigations that Snapchat is an encrypted multimedia messaging application in which users can share text, audio, video, and picture messages that typically disappear shortly after viewing.

15.   After this Snapchat conversation, the CI called the telephone number that "Eric Catalan" provided, which was (805) 757-6328.  In that call, which was recorded and which I have reviewed, CATALAN picked up the call and answered "yes" when asked if he was "Eric" (CATALAN's first name).  The CI then referenced his/her earlier conversations with "homeboy" (C.S.) and asked if they could conduct the deal on Thursday (January 7, 2021).  CATALAN stated he had already told his "connect" that the CI needed the narcotics by that night (January 4, 2021).  In substance and in part, CATALAN then agreed to sell the CI one pound of methamphetamine for $3,200 on January 7, 2021.  CATALAN additionally asked the CI how much the CI had been getting "it" (one pound of methamphetamine) for.  The CI stated he/she could get a pound of methamphetamine in Los Angeles for $2,800.

16.   On January 7, 2021, at SA Traverso's direction, the CI called and sent text messages several times to CATALAN at phone number (805) 757-6328.  During the documented conversations, which I have reviewed, the CI canceled the planned narcotics deal on January 7, 2021, and the CI and CATALAN agreed to talk again over the weekend.

17.   On January 9, 2021, CATALAN called the CI from phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN and the CI agreed to conduct their prearranged narcotics deal on January 14, 2021.  CATALAN stated he needed to have his "connect" drop the narcotics off with him.

18.   On January 12, 2021, at SA Traverso's direction, the CI called CATALAN at phone number (805) 757-6328.  During the

7

recorded conversation, which I have reviewed, CATALAN and the CI arranged to conduct the narcotics deal during the night of January 13, 2021, and CATALAN agreed to have his connection bring the methamphetamine to Lompoc, CA.

19.  On January 13, 2021, CATALAN initiated a series of recorded phone calls and text message conversations with the CI, via phone number (805) 757-6328.  During the conversations, which I have reviewed, CATALAN stated his connection was "feeling iffy" because of the two previous canceled deals. CATALAN stated his connection did not want to drive up to Lompoc with the narcotics.  The CI then inquired whether CATALAN had any drugs to sell.  CATALAN replied he could sell the CI three ounces of methamphetamine for $300 per ounce, two ounces of which CATALAN had already weighed.  CATALAN further stated he had a "bunch of dope that is miscellaneous in different baggies" and that "most of it's junk."  The CI and CATALAN agreed to conduct the deal for three ounces of methamphetamine later that night.  CATALAN later provided his address by text message as an address on Q Street in Lompoc, CA.

20.  After speaking with ATF SA Bryan Traverso, SBSO Detective Robert DeBarge, and reviewing the audio and video recordings of the deal, I learned the following series of events from January 13, 2021:

a.  On the evening of January 13, 2021, the CI met SA Traverso and ATF SA Ricky Chan at a predetermined meeting location.  At the location, SA Traverso and SA Chan searched the CI and the CI's vehicle for contraband, with negative results.

8

Next, SA Traverso and SA Chan equipped the CI with an electronic monitoring and recording device. SA Traverso then provided the CI with government funds to purchase the methamphetamine from CATALAN.

b.   After providing the CI with government funds to purchase the methamphetamine from CATALAN, SA Traverso directed the CI to go to CATALAN's residence.

c.   The CI then exited the predetermined meeting location and proceeded to CATALAN's residence. At the same time, SA Chan and SA Traverso followed the CI from the predetermined meeting location to CATALAN's residence. Once the CI arrived at CATALAN's residence, SBSO personnel continued to maintain visual surveillance of the CI.

d.   Upon arriving at CATALAN's residence, the CI contacted CATALAN via a recorded phone call to phone number (805) 757-6328 and informed CATALAN he/she was on CATALAN's block. From listening to the recording, I learned that CATALAN confirmed his residence was the corner unit and, after a few moments, came to the CI's vehicle. CATALAN then handed approximately 85 grams of methamphetamine to the CI and the CI provided CATALAN with $900 in government funds.

e.   From reviewing the recording of the deal, I heard CATALAN state that he just got out of prison (for a year) and did his time in Santa Barbara County Jail. CATALAN further stated he knew people who made firearms and agreed to sell the CI firearms in the future should CATALAN get any. CATALAN stated he had a "homie in Arizona" and could get "ARs and AKs"

9

for $600, while selling them in California for $1,500.  CATALAN then stated he knew someone who was selling an AR-style rifle recently.

f.   Shortly after this, the CI drove away from the area of CATALAN's residence.

g.   After the CI left the area of CATALAN's residence, SA Traverso and SA Chan followed the CI back to a predetermined meeting location.

h.   At the meeting location, SA Traverso took approximately 85 grams of methamphetamine from the CI and placed it into ATF custody.  After this, SA Traverso recovered the electronic monitoring and recording devices from the CI.  SA Chan and Detective DeBarge searched the CI and CI's vehicle for additional contraband with negative results.

21.  On January 16, 2021, I showed the CI two images of CATALAN, which I obtained from Santa Barbara Sheriff's Department.  The CI identified CATALAN as the person from whom he/she had just purchased the methamphetamine.

a.   DEA Southwest Laboratory testing has confirmed that the CI purchased approximately 80 grams of methamphetamine from CATALAN.

C.   **February 10, 2021 Purchase of Approximately One Pound of Methamphetamine from CATALAN and TORRES**

22.  On January 14, 2021, at SA Traverso's direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN and the CI discussed the CI purchasing a pound of methamphetamine from

10

CATALAN in the future.  The CI then asked CATALAN to let him/her know if CATALAN came across any firearms to sell, which CATALAN agreed to do.

23.  On January 27, 2021, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, the CI asked if he could purchase a pound of methamphetamine from CATALAN in Santa Barbara, CA, the next day (January 28, 2021).  CATALAN stated his methamphetamine supplier was asking about the CI recently. CATALAN then agreed to conduct the transaction on the afternoon of January 28, 2021.

24.  The next day, on January 28, 2021, at my direction, the CI called and sent several text messages with CATALAN at phone number (805) 757-6328.  During the documented conversations, which I have reviewed, the CI asked CATALAN if the price of a pound of methamphetamine was still $3,200, to which CATALAN replied it was.  CATALAN and the CI then agreed to meet in Santa Barbara, CA around 3:00 p.m. that day to conduct the narcotics transaction.  A few hours later, at my direction, the CI attempted to contact CATALAN via recorded phone calls and documented text messages to set up the deal; however, CATALAN did not respond.  After this, the CI informed me of the phone and text message conversations with CATALAN.  I then directed the CI to cancel the planned narcotics transaction.

25.  After the CI cancelled the planned deal, the CI received a call from CATALAN at phone number (805) 757-6328.  In that recorded call, which I have reviewed, CATALAN apologized to

the CI and claimed, "shit has just been cracking," and took
responsibility for the deal falling through.  CATALAN offered to
go pick up the methamphetamine from his supplier and drive it to
the CI, but then stated he was about to go to Anaheim, CA.  The
CI then asked CATALAN if he heard anything about firearms for
sale, to which CATALAN stated there were "two AR-15s with drum
clips" available three to four days ago.  CATALAN further stated
both of the firearms were selling for $3,000.  The CI inquired
if the firearms were still available and CATALAN stated he would
call his associate and check.

26.  On February 1, 2021, at my direction, the CI called
CATALAN via phone number (805) 757-6328.  During the recorded
conversation, which I have reviewed, CATALAN stated he had not
heard from his associates about the previously discussed AR-15s.
The CI and CATALAN then discussed conducting another narcotics
transaction for a half pound of methamphetamine in the Santa
Barbara or Goleta area, with the CI suggesting they go straight
to CATALAN's methamphetamine supplier to pick up the narcotics.

27.  On February 8, 2021, at my direction, the CI called
CATALAN at phone number (805) 757-6328.  During the recorded
conversation, which I have reviewed, the CI and CATALAN agreed
to conduct a narcotics deal on February 10, 2021.  CATALAN
stated his supplier recently inquired about the CI to see if
he/she was still interested in purchasing the narcotics.  The CI
and CATALAN then agreed to meet in Santa Barbara on February 10,
2021, to conduct the narcotics transaction.

28.  On February 9, 2021, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN asked the CI if he/she was "trying to get the whole thing or what?" which I understand from my training and experience to refer to a full pound of methamphetamine.  The CI asked how much a full pound of methamphetamine would cost and CATALAN stated his supplier could sell a pound for $3,200.  CATALAN and the CI then agreed to meet the following day in the afternoon to conduct the transaction.

29.  On February 10, 2021, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, the CI asked CATALAN if his supplier was still able to conduct the narcotics transaction that afternoon, to which CATALAN replied he was.  CATALAN and the CI then agreed to conduct the transaction in the Goleta, CA area.  CATALAN further stated he was in Lompoc and was "mobile," meaning he had access to a vehicle.

30.  Later that same day, at my direction, the CI called CATALAN at phone number (805) 757-6328.  During the recorded conversation, which I have reviewed, CATALAN stated his methamphetamine supplier suggested the CI and CATALAN come to him (the supplier) to pick up the narcotics.  CATALAN agreed to send the CI the supplier's address, but stated that the supplier wanted CATALAN to be present for the deal too.  Shortly after the call, in a text message conversation, CATALAN provided the address of his supplier as 1029 East Gutierrez Street in Santa Barbara, CA (SUBJECT PREMISES 1).

13

31.   Later on the same day, the CI received a cell phone call from CATALAN via phone number (805) 757-6328.  At my direction, the CI spoke with CATALAN.  During the recorded conversation, which I have reviewed, CATALAN told the CI to park in a location near SUBJECT PREMISES 1.  The CI then asked CATALAN if the methamphetamine supplier lived at SUBJECT PREMISES 1 and CATALAN stated that he did, but the supplier planned to come out of the residence to meet CATALAN and the CI. CATALAN further stated SUBJECT PREMISES 1 was also the supplier's parents' home.  Following this, the CI contacted me and advised me of the phone call with CATALAN.

32.   After speaking with ATF SAs Traverso and Chan, SBSO Detectives DeBarge, Justin DiPinto, Karen McCormick, and Sgt. Neil Gowing, and reviewing the audio and video recordings of the deal, I learned the following series of events from the afternoon of February 10, 2021:

a.   During the afternoon of February 10, 2021, the CI met me, SA Traverso, SA Chan, and Detective DeBarge at a predetermined meeting location.  At the location, SA Chan and Detective DeBarge searched the CI and the CI's vehicle for contraband, with negative results.  Next, SA Traverso and I equipped the CI with an electronic monitoring and recording device.  I then provided the CI with government funds to purchase the methamphetamine from CATALAN.  Following this, Detective DeBarge equipped the CI's vehicle with a GPS tracking device.  I then directed the CI to go to SUBJECT PREMISES 1.

14

b.    Following this, the CI proceeded to SUBJECT
PREMISES 1.  At the same time, SA Chan, SA Traverso, and I
followed the CI from the predetermined meeting location to the
transaction location.  Once the CI arrived at the location, SBSO
personnel continued to maintain visual surveillance of the CI.

c.    Upon arriving at SUBJECT PREMISES 1, the CI
contacted CATALAN via cell phone number (805) 757-6328 and
informed CATALAN the CI was at the location.  During the
recorded conversation, which I have reviewed, CATALAN identified
the CI's vehicle and stated he would come to the CI.  Shortly
after this, SBSO Sgt. Gowing saw CATALAN exit a green Dodge
Durango and enter the CI's vehicle via the front passenger door.

d.    Based upon the recording of the deal that I
reviewed, I learned that while sitting in the CI's vehicle,
CATALAN stated the female in the Durango was his ride from
Lompoc.  CATALAN then stated his supplier at SUBJECT PREMISES 1
was "hella paranoid" and worried about law enforcement from a
previous experience.  CATALAN stated most people weren't "quick"
like the CI, and that the CI was "on point."  CATALAN then
stated he believed his supplier was going to leave his residence
on East Gutierrez, get into his own vehicle (that is, the
supplier's vehicle), and want to drive around and do a
"perimeter check," before conducting the deal.  CATALAN repeated
his supplier was "hella hella cautious."  CATALAN proceeded to
tell the CI he was dropping off money for his supplier that day
and had recently picked up drugs from his supplier.

15

33.   Following CATALAN's statement about his supplier's residence at SUBJECT PREMISES 1, SBSO Detectives conducted record checks and determined that TORRES resided at SUBJECT PREMISES 1.  We also obtained a booking photograph of TORRES for reference.  A short time later, SBSO Detective Justin DiPinto, who had reviewed a photograph of TORRES, informed me that he had observed TORRES exit from the rear of SUBJECT PREMISES 1 and enter the rear passenger-side door of the CI's vehicle with the CI and CATALAN, without stopping at any other locations or entering his own vehicle.  I then observed on the recording that the CI started the vehicle and drove a short distance from SUBJECT PREMISES 1 at the request of TORRES, who said it was "more low key."

34.   Detective Karen McCormick told me that she observed the CI drive east on Haley Street and stop at the dead end of the street.

35.   Based upon the recording of the deal that I reviewed, I learned the following:

a.   The CI handed TORRES $3,200 in government funds, after which TORRES handed the CI approximately one pound of methamphetamine, contained in multiple plastic bags and a yellow tequila box.  TORRES proceeded to count the funds and state, "everything's good," which I observed while listening to and watching the recording.

b.   Following this, CATALAN then stated, "this is where I exit," but he offered to play the role of middleman going forward, if needed.  CATALAN and TORRES then agreed, in

16

substance and in part, to have CATALAN provide the CI with
TORRES' phone number, and TORRES insinuated he liked to conduct
his deals quickly.

36.   SBSO surveillance units then observed the CI return to
the area of SUBJECT PREMISES 1 with TORRES and CATALAN in the
vehicle.

37.   Upon returning to the area of SUBJECT PREMISES 1, ATF
SA Ricky Chan observed TORRES and CATALAN exit the CI's vehicle.
SA Chan then saw TORRES walk north on Gutierrez Street back to
SUBJECT PREMISES 1, while CATALAN returned to the Dodge Durango.

38.   After the CI drove away, I, along with other SAs and
Detectives, followed the CI back to a predetermined meeting
location.

39.   At the meeting location, I took the methamphetamine
from the CI and placed it into ATF custody.  I then weighed the
methamphetamine in its innermost packaging and determined it to
weigh approximately 449.4 grams.  Following this, Detective
Robert DeBarge conducted a presumptive field test of the
purchased narcotics and confirmed it to be methamphetamine.  SA
Traverso and SA Chan then recovered the electronic monitoring
and recording devices from the CI.  SA Chan searched the CI and
the CI's vehicle for additional contraband with negative
results.  SA Traverso then showed the CI an unmarked picture of
TORRES.  The CI identified the person in the picture as the
person who handed the CI the methamphetamine.  I then directed
the CI to contact CATALAN via text message and ask for TORRES'
cell phone number, which CATALAN provided as (805) 452-7997.

a.   DEA Southwest Laboratory testing has confirmed that the CI purchased approximately 408 grams of methamphetamine from TORRES and CATALAN.

**D.   February 22, 2021 Purchase of Approximately 328 Grams of Methamphetamine from TORRES**

40.   On February 20, 2021, at my direction, the CI texted TORRES at cell phone number (805) 452-7997.  During the recorded communication, the CI and TORRES made plans to meet in Santa Barbara, CA, to conduct a narcotics deal on February 22, 2021. Following this, the CI contacted me, and told me about his/her communications with TORRES.  Additionally, I have reviewed the text messages exchanged between the CI and TORRES, and learned that on February 22, 2021, TORRES initiated a text message conversation with the CI via cell phone number (805) 452-7997. TORRES confirmed with the CI, in substance and in part, that the narcotics deal scheduled for later that day was still happening. TORRES then told the CI to come to the same location as the previous narcotics deal (in the area of SUBJECT PREMISES 1). Following this, the CI contacted me and told me about his/her conversation with TORRES.

41.   After speaking with ATF SAs Traverso, Chan, Detectives DeBarge, DiPinto, McCormick, and Sergeant Neil Gowing, and reviewing the audio and video recordings of the deal, I learned the following series of events from the afternoon of February 22, 2021:

a.   During the afternoon of February 22, 2021, the CI met with me, SA Traverso, SA Chan, and Detective DeBarge at a

18

predetermined meeting location.  At the location, SA Traverso
and Detective DeBarge searched the CI and the CI's vehicle for
contraband, with negative results.

        b.    I equipped the CI with an electronic monitoring
and recording device.  I then provided the CI with government
funds to purchase the methamphetamine from TORRES.  Following
this, Detective DeBarge equipped the CI's vehicle with a GPS
tracking device.  I then directed the CI to go to SUBJECT
PREMISES 1.

        c.    Following this, the CI exited the predetermined
meeting location and proceeded to the transaction location at
SUBJECT PREMISES 1.  At the same time, I, along with other law
enforcement officers followed the CI from the predetermined
meeting location to the transaction location.  Once the CI
arrived at the location, SBSO personnel continued to maintain
visual surveillance of the CI.

        d.    Upon arriving at SUBJECT PREMISES 1, the CI
texted TORRES and informed TORRES the CI was at the location.
TORRES then identified the CI's vehicle and Detective Jamie
Furber observed TORRES exit SUBJECT PREMISES 1 with an
unidentified female.  Detective Furber then observed TORRES
enter the CI's vehicle, without stopping at any other locations,
while the unidentified female entered a white 2002 Ford SUV.
Sergeant Gowing then observed the CI drive to the corner of
North Alisos Street and Gutierrez Street.

        e.    At this location, based upon what I observed
while monitoring and reviewing the recordings, TORRES handed the

19

CI a brown cardboard box containing methamphetamine, which was in a plastic bag, after which the CI handed TORRES $3,200 in government funds.  TORRES then proceeded to count out the funds in his hands.  After this, the CI and TORRES discussed, in substance and in part, the possibility of future narcotics transactions, including the CI purchasing methamphetamine at a lower price from TORRES.  When the CI stated he/she could probably get a pound of methamphetamine in Los Angeles for $2,600, TORRES replied, in substance and in part, that was "the lowest I'm gonna probably let it go."  TORRES then stated, "the more you come, the lower the price."  When the CI suggested purchasing two pounds of methamphetamine from TORRES in the future, TORRES replied, "25 a piece."  Based upon my training and experience, I believe TORRES meant that he would sell the CI methamphetamine for $2,500 per pound.  TORRES further stated, in substance and in part, he was an "entrepreneur" and sold cell phones, watches, and had his "hands on a few other moneymakers."

        f.   Following this, Sergeant Gowing observed TORRES exit the CI's vehicle and enter the SUBJECT VEHICLE with the unidentified female.  Detective DiPinto then observed TORRES and the unidentified female drive to Best Buy in Goleta in the SUBJECT VEHICLE.

    42.  The CI then drove away and returned to the predetermined meeting location.  I, along with other law enforcement officers followed the CI back to a predetermined meeting location.

43.   At the meeting location, I took the methamphetamine from the CI and placed it into ATF custody.  I then weighed the methamphetamine in its innermost packaging and determined it to weigh approximately 351 grams.  Following this, Detective DeBarge conducted a presumptive field test of the purchased narcotics and confirmed it to be methamphetamine.  After this, I recovered the electronic monitoring and recording devices from the CI.  SA Chan searched the CI and the CI's vehicle for additional contraband with negative results.

a.   DEA Southwest Laboratory testing has confirmed that the CI purchased approximately 328 grams of methamphetamine from TORRES.

44.   A short time later, at my direction, the CI texted TORRES.  During the recorded conversation, which I have reviewed, I learned the following:

a.   The CI told TORRES that the CI weighed the purchased methamphetamine and it was approximately four ounces short of a pound.  After a brief conversation, TORRES offered to bring the remaining four ounces to the CI, but later agreed to make up for the shortcoming during the next transaction.  TORRES then asked the CI if he/she could download the encrypted messaging application Signal.

**E.   March 2, 2021 Purchase of Approximately 534 Grams of Methamphetamine from TORRES**

45.   On February 26, 2021, in a recorded text message, which I have reviewed, TORRES provided the CI with a code to join a Signal messaging application chat with TORRES.

46.   Later, on the same day, at my direction, the CI texted TORRES on the Signal messaging application.  During this conversation, which I have reviewed, TORRES, with a Signal username of "Karo Quintero," told the CI he had the "shirt" the CI was owed.  Based on my training and experience, I believe TORRES was using coded language to say TORRES had the remaining methamphetamine he owed to the CI from the February 22, 2021 deal.  The CI then asked TORRES if he had any firearms available for sale, but TORRES replied firearms were "hard to kome akross (sic).[3]"  TORRES further stated, in substance and in part, that he had "a bunch of food for them. Just not the dogs."  Based on my training and experience, I believe TORRES was using coded language to say TORRES had ammunition, but no firearms.  TORRES then stated, in substance and in part, that he "had the shirt that was promised n a whole different outfit."  Based on my training and experience, I believe TORRES was using coded language to say he had the methamphetamine TORRES owed the CI and an additional pound of methamphetamine.

47.   On February 28, 2021, at my direction, the CI texted TORRES on the Signal messaging application.  During the documented conversation, which I have reviewed, I learned the following:

   a.   The CI and TORRES made plans to conduct a narcotics and ammunition transaction on Tuesday, March 2, 2021.

---

[3] Based on my training, experience, and conversations with senior investigators familiar with Santa Barbara criminal street gangs, TORRES was replacing the letter "c" in his messages with the letter "k" as a sign of his affiliation with the "Krazies" gang.

TORRES agreed, in substance and in part, to sell one pound of methamphetamine to the CI for $3,000, stating he had just taken a loss and couldn't go any lower in price.  The CI inquired about the price of the ammunition TORRES previously mentioned, but TORRES did not respond to the CI's inquiry.  Instead, TORRES stated "thangs" were exclusive, but that he would put the word out for the CI and see what "blows bakk" [sic] that week.  Based on my training and experience, I believe TORRES was using coded language to mean firearms were difficult to obtain.

48.  On March 2, 2021, at my direction, the CI texted TORRES on the Signal messaging application.  During the conversation, which I have reviewed, TORRES stated, in substance and in part, that he "might have some good news," which I believe based on my training and experience means that TORRES may have a firearm or ammunition available for sale.  TORRES additionally informed the CI the planned narcotics transaction that day would occur at a different location.  After exchanging a series of messages regarding the time and location of the narcotics transaction, TORRES provided the CI with an address on the 1100 Block of Punta Gorda Street in Santa Barbara, CA.

49.  After speaking with SA Chan, Detectives DeBarge, McCormick, DiPinto, Josh Cockrell, and Sgt. Gowing, and reviewing the audio and video recordings of the deal, I learned the following series of events from the afternoon of March 2, 2021:

a.  During the afternoon of March 2, 2021, the CI met with me and SA Chan at a predetermined meeting location.  At the

location, I searched the CI and the CI's vehicle for contraband, with negative results.  Next, SA Chan equipped the CI with an electronic monitoring and recording device.  I then provided the CI with government funds to purchase the methamphetamine and potential firearm or ammunition from TORRES.  Following this, I equipped the CI's vehicle with a GPS tracking device.  I then directed the CI to go to the address on the 1100 Block on Punta Gorda Street in Santa Barbara.

       b.    Following this, the CI exited the predetermined meeting location and proceeded to the address on the 1100 Block on Punta Gorda Street.  At the same time, SA Chan and I followed the CI from the predetermined meeting location to the transaction location.  Once the CI arrived at the location, SBSO personnel continued to maintain visual surveillance of the CI.  During this time, Detective DiPinto observed TORRES exit the SUBJECT VEHICLE outside of SUBJECT PREMISES 1 and walk in the direction of the transaction location.

       c.    Upon arriving at the prearranged location on the 1100 Block of Punta Gorda Street, the CI contacted TORRES via a Signal message and informed TORRES the CI was at the location.  Detective Cockrell observed TORRES meet with two unidentified Hispanic males outside the prearranged meeting location on Punta Gorda Street, then walk northbound towards the 1200 Block of Punta Gorda Street, before entering the front passenger door of the CI's vehicle.

       d.    When reviewing the recordings, I learned the following:

i.   TORRES, upon entering the CI's vehicle, stated his associates were at his "trap pad," which I understand, based on my training, experience, and conversations with senior investigators, to be a reference to the location being a potential narcotics stash house.[4]  TORRES then directed the CI to drive to the SUBJECT VEHICLE and said the methamphetamine was in the SUBJECT VEHICLE.

ii.   Detectives McCormick and DiPinto observed the CI drive north on Salinas Street and turn right onto Eucalyptus Hill Road.  After this, Detective DiPinto observed the CI drive up Eucalyptus Hill Road, back down to Salinas Street, and down to East Gutierrez Street, where TORRES had previously parked the SUBJECT VEHICLE.

iii. During the recordings I monitored and reviewed, TORRES stated it had been "hot" in his area and exited the CI's vehicle.  I observed TORRES then go to the trunk of the SUBJECT VEHICLE, remove a backpack, and return to the CI's vehicle.  The CI then handed TORRES $3,000 in government funds, which TORRES proceeded to count while the CI drove to SUBJECT PREMISES 1.  While driving, TORRES added, in substance and in part, that he was a "hot fucking item right now," and was being cautious.  I heard the CI and TORRES discussing the need to be careful, and TORRES stating he was a "two-striker" (referencing California's Three Strikes sentencing law).

---

[4] As discussed below, I later determined the location of this "trap pad" to be SUBJECT PREMISES 2.

iv.   After this, in the recordings I reviewed, TORRES placed a bag containing methamphetamine in the backseat of the CI's vehicle and said he weighed the product himself. The CI then discussed potentially assembling a robbery crew with TORRES, to which TORRES asked if he could "bring my own equipment."  TORRES then said, in substance and in part, that he usually conducts narcotics deals at breweries or restaurants, and that TORRES would typically hand the buyer the keys to the SUBJECT VEHICLE and tell the buyer the product is in the trunk of the SUBJECT VEHICLE.  TORRES further said, in substance and in part, the police caught him before in the area of his residence, and the police then searched his house (SUBJECT PREMISES 1) at the same time.

50.  Shortly after this, TORRES exited the CI's vehicle in the area of SUBJECT PREMISES 1.  The CI then departed the area and returned to the predetermined meeting location.

51.  After the CI exited the area of SUBJECT PREMISES 1, I along with other law enforcement officers, SA Chan, and Detective DeBarge followed the CI back to a predetermined meeting location.

52.  At the meeting location, I took the methamphetamine from the CI and placed it into ATF custody.  I then weighed the methamphetamine in its innermost packaging and determined one package to weigh approximately 113 grams and the other to weigh approximately 454 grams.  Following this, I recovered the electronic monitoring and recording devices from the CI.

26

Detective DeBarge then searched the CI and I searched the CI's vehicle for additional contraband with negative results.

      a.   DEA Southwest Laboratory testing has confirmed that the CI purchased approximately 534 grams of methamphetamine from TORRES.

## F.  March 16, 2021 Installation of a Pole Camera on Punta Gorda Street

53.  On March 16, 2021, I, along with other SAs, installed a pole camera on the 1200 Block of Punta Gorda Street in Santa Barbara, CA.  After monitoring and reviewing the video footage from the camera from March 16 to April 13, 2021, I observed the following:

      a.   TORRES often entered the Holiday Mobile Home Park located at 1212 Punta Gorda Street in the SUBJECT VEHICLE or on foot.  I primarily observed TORRES enter the mobile park approximately between the late afternoon and early morning hours from March 16 to April 13, 2021 on numerous occasions.  TORRES would often park the SUBJECT VEHICLE at 1220 Punta Gorda Street and walk up the driveway into 1212 Punta Gorda Street, or drive into 1212 Punta Gorda Street and park out of view of the camera.

## G.  April 28, 2021 Surveillance of TORRES and the SUBJECT VEHICLE

54.  On March 26, 2021, the Honorable Louise A. LaMothe, United States Magistrate Judge, issued a warrant in case number 2:21-MJ-01482 authorizing the government to install a GPS tracking device on the SUBJECT VEHICLE.  On March 31, 2021, I, along with other SAs, installed a GPS tracking device on the SUBJECT VEHICLE to supplement the pole camera on the 1200 Block

of Punta Gorda Street.  Based upon information from the GPS
tracking device and pole camera, I determined TORRES drove the
SUBJECT VEHICLE from SUBJECT PREMISES 1 to the area of 1212
Punta Gorda Street as frequently as multiple times a day.

55.  On April 28, 2021, I conducted surveillance in the
area of 1212 Punta Gorda Street in Santa Barbara, CA.  During
the surveillance, I observed the following:

a.  At approximately 1815 hours, I, using GPS data
from the tracking device I previously attached to the SUBJECT
VEHICLE, established surveillance on the SUBJECT VEHICLE.  Upon
establishing surveillance, I observed the SUBJECT VEHICLE parked
in front of SUBJECT PREMISES 1.

b.  At approximately 1930 hours, using GPS data, I
determined the SUBJECT VEHICLE left the area of SUBJECT PREMISES
1.

c.  At approximately 1952 hours, using GPS data, I
determined the SUBJECT VEHICLE entered the Holiday Mobile Home
Park located at 1212 Punta Gorda Street in Santa Barbara, CA.

d.  At approximately 1954 hours, I observed the
SUBJECT VEHICLE parked in front of a mobile home with white and
gray-colored siding, and red-colored coverings over the windows
(I later determined this to be mobile home space 13 – SUBJECT
PREMISES 2).  I then observed TORRES, wearing a white baseball
hat, dark shirt, and white socks, walk from his vehicle, up the
front porch of the white and gray mobile home, and enter the
front door of SUBJECT PREMISES 2.

28

e.   At approximately 2041 hours, I observed TORRES exit the front of the mobile home located at space 13 (SUBJECT PREMISES 2) with an unknown female.  I then observed TORRES enter the driver's seat of the SUBJECT VEHICLE, while the unknown female entered the passenger seat.  I terminated surveillance shortly after.

56.  On April 29, 2021, I conducted surveillance on SUBJECT PREMISES 2.  During the surveillance, I observed the following:

a.   At approximately 0900 hours I observed a mobile home with white and gray-colored sidings and red-colored coverings over the windows.  I also observed the number '13' posted on an electricity meter in front of SUBJECT PREMISES 2. I terminated surveillance shortly after.

**H.   Continued GPS Tracking of the SUBJECT VEHICLE and Investigation into SUBJECT PREMISES 1 and SUBJECT PREMISES 2**

57.  On May 5, 2021, the Honorable Alka Sagar, United States Magistrate Judge, issued an order in the same case continuing the tracking device on the SUBJECT VEHICLE for an additional 45 days.  The GPS tracking device on the SUBJECT VEHICLE shows that TORRES has continued to drive to the area of SUBJECT PREMISES 2.  For example, the SUBJECT VEHICLE entered and exited a Geofenced area of about 100-300 meters around SUBJECT PREMISES 2 the following times between May 18 and May 25, 2021:

| DATE | ENTERED | EXITED |
|------|---------|--------|
| 5/18/21 | 4:15 p.m. | 4:29 p.m. |
| 5/18/21 | 6:30 p.m. | 8:08 p.m. |
| 5/19/21 | 3:59 a.m. | 6:13 a.m. |

| 5/19/21 | 2:02 p.m. | 2:54 p.m. |
|---------|-----------|-----------|
| 5/19/21 | 11:13 p.m. | 11:19 p.m. |
| 5/19/21 | 11:29 p.m. | 12:07 a.m. (next day) |
| 5/20/21 | 6:41 p.m. | 7:20 p.m. |
| 5/21/21 | 12:08 a.m. | 2:50 a.m. |
| 5/21/21 | 11:02 a.m. | 11:54 a.m. |
| 5/21/21 | 5:15 p.m. | 6:09 p.m. |
| 5/21/21 | 7:03 p.m. | 7:30 p.m. |
| 5/22/21 | 2:30 a.m. | 4:51 a.m. |
| 5/22/21 | 17:23 p.m. | 5:46 p.m. |
| 5/23/21 | 1:29 a.m. | 2:16 a.m. |
| 5/23/21 | 11:24 a.m. | 12:11 p.m. |
| 5/23/21 | 5:31 p.m. | 6:16 p.m. |
| 5/24/21 | 12:22 a.m. | 1:03 a.m. |
| 5/25/21 | 2:08 a.m. | 2:58 a.m. |
| 5/25/21 | 4:12 a.m. | 7:06 a.m. |
| 5/25/21 | 7:55 p.m. | 8:05 p.m. |

58. On May 10, 2021, I spoke with TORRES' parole officer, who informed me that TORRES resides in a multi-family residence at 1029 East Gutierrez Street in Santa Barbara (SUBJECT PREMISES 1). TORRES' parole officer told me that TORRES specifically resides in the part of the building that is located below street level, and that the entrance to TORRES' residence is located at the bottom of the driveway. (The house also has another unit at street level, directly above TORRES' residence, which has another entrance.)

## V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

59. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences, stash houses, and vehicles.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

31

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residences, stash houses, and vehicles.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residences, stash houses, and vehicles, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, stash houses, and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residences, stash houses, and vehicles, or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to

diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[5]

60.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[5] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

34

develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

61.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

62.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.  Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress TORRES' and/or CATALAN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of TORRES' and/or CATALAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

63.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

64.  For the reasons described above, there is probable cause to believe that CATALAN and TORRES have violated 21 U.S.C. § 841(a)(1) (Distribution of a Controlled Substance).  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at or in SUBJECT PREMISES 1, SUBJECT PREMISES 2, the SUBJECT VEHICLE, and the persons of CATALAN and TORRES, as described in Attachments A-1, A-2, A-3, A-4, and A-5, respectively.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this <u>3rd</u> day of
June, 2021.

_____
HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE